UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

**FILED**

00 NOV 27 PM 3:00

U.S. DISTRICT COURT
N.D. OF ALABAMA

LORI A. STONEY,⁣ )
)
    Plaintiff, )
)
vs. ) CIVIL ACTION NUMBER: CV-99-S-0955-S
)
CITY OF HOMEWOOD, ALABAMA, )
)
    Defendant. )

**ENTERED**

NOV 27 2000

### MEMORANDUM OPINION

Plaintiff alleges that she was subjected to a sexually hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*[1] The action presently is before the court on defendant's motion for summary judgment. Upon consideration of the motion, briefs, pleadings, and evidentiary submissions, the court finds that defendant's motion is due to be granted.

### I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in relevant part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[1] Plaintiff's complaint originally asserted supplemental state law claims for invasion of privacy and battery against an individual defendant named Harold Parker, the Deputy Chief of the City of Homewood Fire Department. Those claims (and accordingly that defendant) subsequently were dismissed by an order entered on March 17, 2000. *See* doc. no. 28; *see also* doc. no. 26 (joint motion to dismiss defendant Harold Parker with prejudice).

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant discharges this burden by showing the court there is an absence of evidence to support the non-movant's case. *See Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593.

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor

of the non-movant are not unqualified, however.  "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment."  *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted).  Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988).  A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).  The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail

as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512. With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiff.

## II. FACTUAL BACKGROUND

Plaintiff Lori A. Stoney was the first (and, thus far, the only) female firefighter to be hired by defendant. She has been employed by the City of Homewood, Alabama, as a fire-fighter/emergency medical service paramedic since April 1, 1990. The fire department is organized in a para-military hierarchy. The mayor is the ultimate civilian authority. He appoints the Fire Chief and approves all personnel decisions, such as hiring, firing, and promoting fire department employees. The Fire Chief supervises all aspects of the department's day-to-day operations. He is responsible for equipment purchases, personnel, and insuring compliance with city and departmental policies.[2] The Chief is assisted by a Deputy Fire Chief, who is the "administrative officer that handles day-to-day problems and reports and things of that nature...."[3] Firefighters are stationed at one of the city's three

---

[2]Bresnan deposition at 10-14. Unless otherwise noted, depositions submitted as part of plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment (doc. no. 34) will be cited with the name of the person deposed and the page number.

[3]Parker deposition at 10.

4

fire stations and work in 24 hour shifts.  Each shift is supervised by a captain, also known as the shift commander.  The immediate supervisors of firefighters hold the rank of lieutenant.

Firefighters work in close quarters during shifts:  eating, sleeping, bathing at the station, and maintaining fire equipment. Lieutenant David Slimp described the prevailing atmosphere as follows:

> [Y]ou spend more waking hours with your fire fighting crew than you do with your family as a matter of course, and you have a lot of interaction and conversation.  And, I mean, in the average day, you are probably awake at least sixteen hours you are together.  So there's — you know, there's quite a lot of conversation <u>and banter</u> back and forth there.[4]

"Banter" <u>is</u> the operative word.  For amusement, firefighters engage in childish antics that often are, to put it charitably, base and crude.  Some examples of boorish behavior in which even the plaintiff engaged include belching, farting, wrestling,[5] and practical joking.  On one occasion, for example, plaintiff glued together the underwear of her male co-workers.[6]

Despite her participation in such ribaldry, plaintiff alleges that throughout her employment she has been subjected to sexually demeaning comments and conduct by her male co-workers and

---

[4]Slimp deposition at 11 (emphasis added).

[5]Stoney deposition at 346-49.

[6]*Id.* at 349.

supervisors.   She has submitted evidence spanning a ten year period, including detailed diary entries describing her experiences at work.

One of defendant's principal contentions is that many of the incidents documented by plaintiff occurred more than 180 days prior to the date on which she filed her EEOC charge.   For purposes of subsequent discussion, therefore, the incidents will be grouped into three categories:   1) events occurring more than 180 days prior to the date on which plaintiff filed her EEOC charge; 2) events occurring within the 180 day period preceding the filing of plaintiff's EEOC charge; and 3) events that occurred after the filing of her EEOC charge.   Again, this court's descriptions of the following incidents either are not disputed, or are stated in a light most favorable to the plaintiff.

**A.   Events Occurring More Than 180 Days Prior to Plaintiff's EEOC Charge**

Plaintiff filed her EEOC charge on April 23, 1998.   The majority of the events about which she complains in this action occurred several years prior to that date.   Plaintiff complains, for example, about being chased with a snake during basic recruit training in 1990.   She described the incident as follows:

> We were conducting classes at Station 2.   We were going over forcible entry tools.   We had walked out behind in

6

> the little picnic area of Station 2.  Everybody was kind
> of snickering.  I really didn't know what was going on
> until I looked down at my feet.  Somebody had placed a
> copperhead at my feet.
>
> . . .
>
> Lieutenant McCombs placed the stake at my feet.  The
> snake was still doing its jaws.  A copperhead is a
> poisonous snake.  I am terrified of snakes.[7]

She stepped back, and "told them to get rid of the snake."  Later,

another recruit, Don Huff, came towards her holding the snake.

Plaintiff recalled: "At some point in time, he got right in front

of my face.  There was an ax next to me.  I picked it up to defend

myself.  Somebody took it away from me."[8]  Plaintiff then was

subjected to the snake a third time.  She remembered:  "[L]ater I

went out to leave and somebody had placed the snake across the side

mirror of my truck....  I brushed up against the thing going to get

into my vehicle."[9]  She then reported the incident to Lieutenant

Roddy Loller, who "got rid of the thing."[10]

On February 16, 1993 — five years prior to plaintiff's EEOC

charge — one of her co-workers, James Belyeu, speculated that the

unemployment rate was high because "blacks and women are stealing

---

[7]*Id.* at 84-85.

[8]*Id.* at 87.

[9]*Id.* at 88.

[10]*Id.*

their jobs."[11]  Later, while discussing a "Dateline" television news special on stress among emergency medical service workers, Lt. Rusty McCombs said:  "I see the problem up here is[,] it is all coons and women."[12]

Beginning in October of 1993 — more than four years prior to plaintiff's EEOC charge, and, following the birth of plaintiff's fourth child (her second while employed by defendant) — co-workers taunted plaintiff when she expressed breast milk.  Plaintiff used a training room to express her breast milk.[13]  On several occasions, co-worker Mike Anastasia beat on the door, rattled the door knob, and attempted to walk into the room.[14]  He asked plaintiff whether she was "turned on" by expressing breast milk, and admitted that he listened to her through the door.[15]  Co-workers referred to the training room as the "milking room."[16]  One co-worker, Vann Parson, referred to the period during which plaintiff was nursing as "suckle time."[17]  This behavior continued until plaintiff no longer

---

[11]Id.

[12]Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ¶ 15.

[13]Stoney deposition at 175.

[14]Id. at 99.

[15]Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ¶ 10.

[16]Stoney deposition at 180.

[17]Id. at 176.

needed to express breast milk.[18]   Plaintiff recalled a specific

incident that occurred on October 14, 1993:

> Mike [Anastasia] was doing some personal work in the
> training room.  I walked in and asked if I could use the
> training room.  He throws his papers up and rolls his
> eyes.  He said, "Don't tell me it is suckle time
> again." [19]

Anastasia then stated that Vann Parson was right when saying the

other firefighters should demand "equal suckle time."[20]

Throughout Plaintiff's employment, firefighter Johnny West

"thought it was funny ... whenever I walked in front or behind the

rescue truck to rev the engine and lurch the truck forward."[21]  On

May 31, 1996, however, almost two years prior to plaintiff's EEOC

charge, West accidentally ran over plaintiff's foot while engaged

in such antics.[22]

> The action continued right up until this incident
> happened where he actually — I was down placing a
> hydrant marker and he ran over my foot doing the same
> thing.  Every time I would move, he would lurch the
> rescue unit.  He actually ran over my foot.  This was
> written up.  And even to this day, there are times when
> I walk in front or behind him and he is driving and he
> does the same thing. [23]

---

[18]*Id.*

[19]*Id.* at 281.

[20]*Id.* at 282.

[21]*Id.* at 130.

[22]This is the most severe incident about which plaintiff complains, and it
is discussed in more detail *infra*, in section III.C.4.

[23]*Id.*

B.    **Events Occurring Within the 180 Day Period Preceding the Filing of Plaintiff's EEOC Charge**

Plaintiff submitted evidence of three incidents occurring within the 180 day period immediately preceding April 23, 1998, the date on which she filed her EEOC charge.

First, during February of 1998, when plaintiff was pregnant with her fifth child (her third while employed by defendant), she requested larger turnout pants to fit over her protruding abdomen, but was required to wait two weeks before receiving them.[24]

Second, on February 18, 1998, Deputy Chief Parker made offensive comments regarding plaintiff's pregnancy, and touched her stomach without permission.  Plaintiff described the encounter in a February 22nd complaint addressed to Chief Bresnan:

> Upon my arrival, he [Parker] began to discuss the situation regarding my pregnancy and showed me a fax he had sent to my personal physician requesting information regarding my medical status....
>
> . . . .
>
> During the course of the conversation that lasted approximately 1 ½ hours, Chief Parker made the following statements:
>
> 1.    He asked me to stand up.  When I did, he reached and smoothed my shirt out over my stomach and said that he wanted to see how far my belly stuck out.
>
> 2.    He stated that since I was concerned with the

---

[24]Turnout pants are a piece of safety equipment.  *Id.* at 206, 218-19.

financial aspect of my situation, he would have to be concerned for the baby. (Strongly implying that I am not concerned with the welfare of my child.)

3.   He looked around the room to make sure there was no one around and then told me that I had not met the time qualifications for either the run or the hose drag and that I had the job because he falsified those times. He stated that he had never told anyone this and that I should not discus [sic] this with anyone.

4.   He stated that the history of giving light duty assignments was based on merit. If you worked extra and put in extra effort arrangements were made for an individual to have a light duty assignment.

5.   He asked me if I had figured out what caused these things. (pregnancies)

6.   He told me (while being careful to state that "this is off the record") that the mayor had refused to reassign me and that it was not relevant that I had been placed on light duty for two prior pregnancies.

7.   He said (while implying that he was joking) that when I was ready to return to work, he was going to send me to a psychiatrist rather than to the city doctor for a return to work release.

... Chief Parker's actions were both unwelcome and unnecessary. For him to have me stand up and for him to touch my shirt to see how far my belly is sticking out is unconscionable....[25]

Finally, on March 22, 1998, when plaintiff was 25 weeks into her pregnancy, she was "put on the engine," where she would have to engage in heavy lifting and fight fires.[26]

---

[25]Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment (doc. no. 34), Ex. 8.

[26]Id., Ex.43.

**C.    Events Subsequent to Plaintiff's EEOC Charge**

During February of 1999, plaintiff was sent to Homewood Fire Station No. 1, in response to a request for the temporary loan of a driver.[27]   When she arrived at Station No. 1, however, Rusty McCombs, the lieutenant in charge of the crew and engine on which plaintiff would drive, rearranged duties in a manner that deprived her of the driver position.[28]   (Plaintiff asserts that Lt. McCombs had said in 1991 or 1992 — some seven or eight years before this incident — "I'm not going to have a [expletive deleted] woman driving me around on the fire truck."[29])

On February 18, 1999, Lt. McCombs held an impromptu driver training class in which plaintiff was singled out.

> Robert Curtsy told me at a later date, Rusty McCombs made the comment to him that the training was being done specifically because of me.  Robert made some comment about ... "I see y'all are up here."  Rusty says, "Yes. We are here to do the girl driver training."  Later I went out to check out Engine 2.  Rusty, I think, told us to go out there.  He called Robert into the first front office at Station 2 and says, "What made you say that?"  Robert basically said ... because she wasn't allowed to drive and that was wrong, now we are going to do this training to cover up because she said she wanted more experience.  Rusty said, "You're right.  We are doing this because of her." [30]

---

[27]Stoney deposition at 305.

[28]Id.

[29]Id. at 319.

[30]Id. at 309.

Sometime during late 1999 or early 2000, Dale Dudley, who then was acting as plaintiff's supervisor, reached toward her in a manner suggesting that he intended to grasp plaintiff's breasts. She recounted the incident in the following manner:

> We had a call to one of the hotels on Lakeshore Parkway — I'm not sure which one — where a sprinkler head was going off due to a fire in a storage room. We took care of the sprinkler head. I walked out. He was standing at the engine. As I took my coat off, I said, "I got soaked." He says to me, "Let's see," and stops just shy of my breasts and laughed and walked away.[31]

## D.   Plaintiff's Response to the Harassment

Plaintiff has demonstrated that she was aware of her federally protected rights throughout her employment at the Homewood Fire Department. She sought legal representation as early as 1993, regarding her anticipated pregnancy leave. She has submitted lengthy diary entries detailing the specifics of her experiences in the fire department. The following entry was recorded on January 23, 1993:

> Kuron from the international called and he is going to have their lawyers look into my situation. He says that in the absence of a written policy which was in effect prior to my being pregnant the courts should uphold that they must do as before.... [32]

Four days later, on January 27, 1993, plaintiff recorded that she

---

[31]*Id.* at 115-116.

[32]Brief in Support of Defendant's Motion for Summary Judgment, Ex. 3.

"[w]ent to one [apparently Station No. 1] and read over the 'Johnson Controls' suit.  ...  I spoke with Mr. Rainey (the union attorney).  He says that it sounds like I should be given light duty.  I also called EEOC.  I will see them tomorrow."[33]  Plaintiff in fact drove to the EEOC office the following day.  She wrote, "Went to EEOC.  They said I would have grounds for a case just as soon as I am told there is no light duty."[34]

Plaintiff was still consulting an attorney during March of 1993.  Her journal entry for March 7th records, "Got a phone call in to the atty.  She said give Chief the letters tomorrow morning. If I do not get a written answer or if the answer is no, she would handle the case."[35]  Plaintiff discussed this attorney consultation during deposition:

> Q.  When is the first time you consulted a lawyer in any form or fashion about complaints about your job at Homewood?
>
> A.  When I was pregnant in 1993 and again went through — I had light duty the first time I was pregnant.  We don't know if there is going to be light duty or not.  I consulted an attorney named Lynn Campisi.[36]

Even assuming that plaintiff's early attorney contacts concerned her rights under the Family and Medical Leave Act of

---

[33]*Id.*

[34]*Id.*

[35]*Id.*

[36]Stoney deposition at 64.

1993, it still is clear that she was aware of federal protection against sexual harassment as early as December 30, 1995, because a journal entry on that date records the following:  "I told Jim I did not want to hear these things because it caused me stress <u>and created a hostile working environment</u>."[37]

Plaintiff's journal entry four days later also demonstrates an awareness of her right to assert claims such as those alleged in this complaint; she wrote on January 3, 1996, "I don't think many people would try as hard for as long as I have to get along and do the job & about 1 year into a new female addition this city would get nailed with a <u>sexual harrassment</u> [sic] or <u>gender harrassment</u> [sic] case big as daylight."[38]

Plaintiff again considered consulting an attorney on February 10, 1996, because she recorded that "at least next shift is my off day!  Maybe I should use it to consult an attorney...."[39]

### III. DISCUSSION

Defendant initially argues that plaintiff failed to timely file her EEOC charge, and that her complaint exceeds the scope of that charge.

---

[37]Brief in Support of Defendant's Motion for Summary Judgment, Ex. 3 (emphasis supplied).

[38]*Id.* (emphasis supplied).

[39]Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment (doc. no. 34), Ex. 43.

## A.   Timeliness

A plaintiff must satisfy a number of administrative prerequisites before filing a suit based upon Title VII. Foremost among these is the requirement that a charge of discrimination be submitted to the Equal Employment Opportunity Commission within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1).

"[T]he purpose of the charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC." *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970).[40] This prerequisite reflects a congressional intent to encourage voluntary compliance and conciliation, rather than litigation, as the "preferred means" of "eliminating those practices and devices that discriminate on the basis of race,

---

[40]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981. *See also* Virgo v. Riviera Beach Associates, Ltd., 30 F.3d 1350, 1358 (11th Cir. 1994), where the Eleventh Circuit observed:

> Generally speaking, the EEOC is charged with the task of investigating allegations of civil discrimination and harassment in the employment context and determining whether there is any reason to believe the allegations are true. Under 42 U.S.C. § 2000e-5, a person who wants to file a lawsuit under Title VII must first file a charge with the Equal Employment Opportunity Commission alleging a Title VII violation and exhaust all remedies provided by the EEOC. If the conciliation efforts are unsuccessful, the EEOC will inform the parties and issue a letter authorizing the complainant to file a Title VII suit.

color, religion, sex, or national origin." *Alexander v. Gardner-Denver Company*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974); *see also Sims v. Trus Joist MacMillan*, 22 F.3d 1059, 1063 (11th Cir. 1994) ("Congress clearly intended for the EEOC and the complaining party to attempt a reconciliation of the charge of discrimination before proceeding to federal court, and thus it imposed a time limit during which this reconciliation should occur....").

If a plaintiff fails to file a charge within the 180 day period, his or her claim may be procedurally barred for untimeliness. *See Delaware State College v. Ricks*, 449 U.S. 250, 256, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980); *Everett v. Cobb County Sch. Dist.*, 138 F.3d 1407, 1410 (11th Cir. 1998). Although administrative exhaustion "is not a jurisdictional prerequisite to suit in federal court," *Zipes v. Trans World Airlines*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982), it is a condition precedent to the maintenance of an action upon which plaintiff bears the burden of proof.[41] This procedural requirement

---

[41]*See Jackson v. Seaboard Coast Line Railroad Company*, 678 F.2d 992, 1010 (11th Cir. 1982):

> [A] plaintiff must generally allege in his complaint that "all conditions precedent to the institution of the lawsuit have been fulfilled." ... If the defendant doubts the veracity of plaintiff's allegation, in whole or in part, then the defendant may deny

17

is, however, "subject to waiver, estoppel, and equitable tolling."
*Id.*

## 1.   Continuing violation doctrine

One equitable exception to the 180 day filing requirement
which courts have recognized is the so-called "continuing violation
doctrine," which allows a plaintiff to revive, and make actionable,
time-barred acts of discrimination by connecting them to
discriminatory acts falling within the applicable limitations
period.   As the former Fifth Circuit explained in *Gonzalez v.
Firestone Tire & Rubber Co.*, 610 F.2d 241 (5th Cir. 1980),

> [a] past act of discrimination for which a party did
> not file a charge of discrimination with the EEOC within
> the limitations period is legally equivalent to a
> discriminatory act that occurred before the enactment of
> Title VII.   Although such a past discriminatory act may
> continue to effect an employee's present pay and fringe
> benefits, such an effect does not constitute a continuing
> violation of Title VII. ...   "[T]he critical question is
> whether any present violation exists." ...
>
> ...
>
> Where an employee charges an employer with
> continuously maintaining an illegal employment practice,
> he may file a valid charge of discrimination based upon
> that illegal practice until 180 days after the last
> occurrence of an instance of that practice. ...   However,

---

"specifically and with particularity" that the preconditions have
not been fulfilled. ...   The plaintiff then bears the burden of
proving that the conditions precedent, which the defendant has
specifically joined in issue, have been satisfied.   [Citation
omitted.]

> where the employer engaged in a discrete act of
> discrimination more than 180 days prior to the filing of
> a charge with the EEOC by the employee, allegations that
> the discriminatory act continues to adversely affect the
> employee or that the employer presently refuses to
> rectify its past violation will not satisfy the
> requirement of 42 U.S.C. s 2000e-5(e) that the plaintiff
> file his charge of discrimination within 180 days of the
> discriminatory act. ...

*Id.* at 249 (citations omitted); *see also*, *e.g.*, *Waltman v. International Paper Co.*, 875 F.2d 468 (5th Cir. 1989); *Malone v. K-Mart Corp.*, 51 F. Supp. 2d 1287 (M.D. Ala. 1999).

> Although "the precise contours and theoretical bases of
> [the theory of 'continuing violation'] are at best
> unclear," ... there is general agreement that it relieves
> a plaintiff of the burden that all actionable conduct
> must have occurred within 180 days prior to the charge,
> so long as the complaint is timely as to the last
> occurrence. *Id.*;....

*Coon v. Georgia Pacific Corp.*, 829 F.2d 1563, 1570 (11th Cir. 1987) (citations omitted) (alteration in original).

Case law on the subject unquestionably "'is inconsistent and confusing.'" *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 979 n.11 (5th Cir. 1983) (quoting *Dumas v. Town of Mount Vernon*, 612 F.2d 974, 977 (5th Cir. 1980)). "Courts have not formulated a clear standard for determining when alleged discriminatory acts are related closely enough to constitute a continuing violation and when they are merely discrete, isolated,

and completed acts which must be regarded as individual violations." *Berry*, 715 F.2d at 981 (citations omitted).

The Fifth Circuit nevertheless assayed a test in *Berry*, saying that at least three, fact-specific factors are relevant when attempting to determine whether alleged discriminatory acts are sufficiently related to be deemed a continuing violation.

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (*e.g.*, a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Id.* (footnote omitted).

The Eleventh Circuit addressed the continuing violation doctrine in *Roberts v. Gadsden Memorial Hospital*, 835 F.2d 793 (11th Cir. 1988) ("*Roberts I*"), and purported to adopt the *Berry* test. The plaintiff in *Roberts I* alleged that his employer had discriminated against him by denying him fair promotional opportunities because of his race, first in 1978, and then again during 1981. *Id.* at 794-95. The plaintiff did not file a charge

against the defendant until 1981, however, which called into question the timeliness of his claim based upon the 1978 event. *Id.* The Eleventh Circuit addressed the plaintiff's assertion that the earlier claim still could be asserted under the continuing violation doctrine in the following manner:

> The continuing violation doctrine does not exist to give a second chance to an employee who allowed a legitimate Title VII claim to lapse. It is only when a substantial nexus exists between a timely-filed claim and an otherwise time-barred claim that they may be viewed as constituting a single violation, part of which falls within the limitations period. Moreover, the existence of such a nexus serves to alleviate the employer's burden in defending a remote managerial decision. ...
>
> In determining the existence vel non of such a nexus, a court should not rely upon a superficial factual analysis, but rather, should refer to a variety of factors. Such factors include whether the claims were related in subject matter, frequency, and permanence (*i.e.*, whether the act was sufficiently permanent in nature so as to "trigger an employee's awareness of and duty to assert his or her rights"). ...

*Id.* (quoting *Berry*, 715 F.2d at 981).[42]

---

[42] The court in *Roberts I* eventually found that the continuing violation doctrine did not apply to save plaintiff's claim based upon the first denial of promotion during 1978, saying that, while both alleged discriminatory acts involved the same subject matter (denial of a promotion), the facts underpinning each decision were distinctly different. Moreover, two incidents three years apart were not deemed, under the facts presented, to be sufficiently frequent to constitute a continuing violation. 835 F.2d at 800-01.

> Finally, as to the permanence factor, which the Fifth Circuit suggested was the most important of the three, Roberts admitted that he was aware of his rights in 1978. He could have asserted them at that time. GMH [the plaintiff's employer] was able to injure Roberts again only because he knowingly failed to exercise his rights. A claim arising out of an injury which is "continuing" only

Seven months after *Roberts I*, however, the Eleventh Circuit

*sua sponte* granted rehearing, and withdrew the foregoing discussion

of the continuing violation doctrine. *Roberts v. Gadsden Memorial*

*Hospital*, 850 F.2d 1549 (11th Cir. 1988) ("*Roberts II*"). The

*Roberts II* court replaced its previous analysis with the following

statements:

> Here, even if we assume that the 1978 discriminatory act
> continued into the statutory filing period, we must still
> conclude that Roberts' claim based on that incident is
> time-barred. Roberts admitted that he was aware of his
> rights in 1978. He could have asserted them at that
> time. To the extent that GMH [his employer] injured him
> on a continuing basis as a result of the 1978 incident,
> it was only because he knowingly failed to exercise his
> rights. <u>A claim arising out of an injury which is
> "continuing" only because a putative plaintiff knowingly
> fails to seek relief is exactly the sort of claim that
> Congress intended to bar by the 180-day limitation
> period</u>.

*Id.* at 1550 (emphasis supplied). Thus, a plaintiff within the

Eleventh Circuit who is aware of his or her federally protected

civil rights, but who fails to exercise those rights by submitting

a charge of discrimination to the EEOC in a timely manner, may not

later take advantage of the continuing violation equitable

---

> <u>because a putative plaintiff knowingly fails to seek relief is
> exactly the sort of claim that Congress intended to bar by the 180-
> day limitation period</u>.

*Id.* at 801 (footnote omitted) (emphasis supplied).

exception to the 180 day filing requirement. *See also Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1311 (10th Cir. 1999) (dismissing one of plaintiff's failure to hire claims because she "was, at the very least, on inquiry notice of the alleged discrimination as early as 1993, [and] she had a duty to assert her rights at that time").

In a similar vein, the Seventh Circuit recently held that the continuing violation doctrine "comes into play in a sexual-harassment case only when the plaintiff was reasonable not to perceive her working conditions as intolerable until the acts of harassment had, through repetition or cumulation, reached the requisite level of severity." *DeClue v. Central Illinois Light Company*, 223 F.3d 434, 435 (7th Cir. 2000). The *DeClue* court held that the female plaintiff in that case had, under the facts presented, unreasonably failed to seek relief, and thus was barred from relying upon the continuing violation doctrine to salvage sexual harassment claims based upon stale, time-barred acts.

> The incidents that occurred in this case before the ... limitations period included a coworker's deliberately urinating on the floor near where the plaintiff was working, repeated shoving, pushing, and hitting her, sexually offensive touching, exposing her to pornographic magazines, and — the point she particularly emphasizes — failing to make adequate provision for restroom facilities for her. <u>Nothing that happened later</u>, <u>that</u>

<u>is</u>, <u>within the period of limitations</u>, <u>added materially to</u>
<u>the conditions of which she complains</u>; <u>it was just more</u>
<u>of the same</u>.   <u>The earlier incidents thus put her on</u>
<u>notice</u>, <u>and so she can no longer base a claim upon them</u>.

*Id.* at 435-36 (emphasis supplied).

To be sure, the 180 day filing requirement should not be used

to punish plaintiffs who are ignorant of their federally protected

civil rights, or to bar recovery for discriminatory practices that

manifest themselves only gradually and incrementally over time.  A

court "must distinguish between the 'present consequence of a one-

time violation,' which does not extend the limitations period, and

the 'continuation of the violation into the present.'"  *Beavers v.*

*American Cast Iron Pipe Company*, 975 F.2d 792, 796 (11th Cir. 1992)

(citation omitted).  "Where the employer engaged in a discrete act

of discrimination outside the limitations period, allegations that

the discriminatory act continues to adversely affect the employee

or that the employer presently refuses to rectify its past

violation will not satisfy the statute of limitations."  *Knight v.*

*Columbus, Ga.*, 19 F.3d 579, 580 (11th Cir. 1994).

Here, plaintiff sought legal advice as early as 1993.  Her

detailed diary entries make abundantly clear that she was well

aware of her federally protected rights long before the date on

which she finally submitted an EEOC charge.  As in *DeClue*, nothing

24

that happened to plaintiff within the 180-day period immediately preceding the filing of her EEOC charge "added materially to the conditions of which she [now] complains; it was just more of the same." Accordingly, the court finds that plaintiff knowingly, and unreasonably, failed to assert her rights in a timely manner, and that she is not entitled to rely upon the continuing violation doctrine to revive claims based upon time-barred acts and conduct: specifically, those events described in section II.A *supra*.

**B.    Scope of EEOC Charge**

As a general rule, a Title VII plaintiff cannot state claims in a judicial complaint that were not included in her or his EEOC charge.

> This rule serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion ... and of giving the [employer] some warning of the conduct about which the employee is aggrieved. ... [A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge.

*Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (citations omitted); *see also, e.g., Evans v. U.S. Pipe & Foundry Company*, 696 F.2d 925 (11th Cir. 1983) ("[T]he Commission should have the first opportunity to investigate the alleged

discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts.").

Even so, courts take into account the fact that many EEOC charges are drafted by persons untrained in the slippery nuances of federal law and, accordingly, hold that "a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Id.* (citing *Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188, 1195 (7th Cir. 1992)).

Indeed, it is well established by binding authority that "the scope of the EEOC complaint should not be strictly interpreted." *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1970).[43] The former Fifth Circuit instructed district courts that

> procedural technicalities are not to stand in the way of Title VII complainants. Nothing in the Act commands or even condones the application of archaic pleading concepts. On the contrary, the Act was designed to protect the many who are unlettered and unschooled in the nuances of literary draftsmanship. It would falsify the Act's hopes and ambitions to require verbal precision and finesse from those to be protected, for we know that these endowments are often not theirs to employ.

*Id.* The *Sanchez* court emphasized that "the specific words of the

---

[43]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow." *Id.*

The test for determining whether an EEOC charge embraced claims later asserted in a judicial complaint therefore grants a Title VII complainant considerable leeway: "the complaint in the civil action may properly encompass any discrimination like or reasonably related to the allegations [contained in the EEOC] charge and growing out of such allegations" during the pendency of the case before the Commission. *Danner v. Phillips Petroleum Co.*, 447 F.2d 159, 162 (5th Cir. 1971) (citations and internal quotation marks omitted). "In other words, the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Sanchez*, 431 F.2d at 466 (citation omitted). The Eleventh Circuit reiterated this standard in *Griffin v. Carlin*, 755 F.2d 1516 (11th Cir. 1985), saying

> the requirement of exhaustion of administrative remedies is satisfied when the issues (a) are expressly raised in the pleadings before the administrative agency, (b) might reasonably be expected to be considered in a diligent investigation of those expressly raised issues, or (c) were in fact considered during the investigation.

*Id.* at 1522.

When determining the scope of an EEOC charge, the court must

first look to the charge itself.  In this case, plaintiff Lori
Stoney filed a charge that clearly alleged a sexually hostile work
environment and discrimination on the basis of pregnancy.[44]  She
asserted:

> I.  I became employed with the [City of Homewood Fire
> Department] in 1990 as their first, and currently only,
> female firefighter.  I have been sexually harassed and
> subjected to an offensive and sexually demeaning work
> environment.  Throughout my tenure of employment, various
> personnel have informed me that as a female, I was not
> appropriately fit to be a firefighter, and many difficult
> tasks were assigned to me that male employees of the same
> service tenure were not given.  Additionally, after the
> birth of my second child, I was subject to harassment and
> inappropriate sexual comments during the period when I
> was expressing milk for my infant son.

> II.  Most recently, in February 1998, after informing
> department officials that I was pregnant, I was informed
> that light duty may no longer be available to pregnant
> firefighters, even though it has been the Department's
> common practice to offer limited duty to temporarily
> disabled male firefighters and even though they have
> afforded me light duty during previous pregnancies.  Upon
> learning that I was pregnant with my fifth child,
> Assistant Chief Harold Parker stated, "Don't you know
> what causes this?" i.e., pregnancy, and told me that when
> I return to full duty he was going to send me to a
> psychiatrist.  He also smoothed my shirt over my abdomen

---

[44] 42 U.S.C. § 2000e(k) expressly provides that the phrases "because of
sex" or "on the basis of sex" as used in Title VII jurisprudence

> include, but are not limited to, because of or on the basis of
> pregnancy, childbirth, or related medical conditions; and women
> affected by pregnancy, childbirth, or related medical conditions
> shall be treated the same for all employment-related purposes,
> including receipt of benefits under fringe benefit programs, as
> other persons not so affected but similar in their ability or
> inability to work....

during conversations about my pregnancy.  I have reported
this harassment to the Department.   They have taken no
action.

III.   I believe that I am being harassed, intimidated,
and subjected to a sexually demeaning work environment,
and that I am being discriminated against in the terms
and conditions of my employment because of my gender
(female) in violation of Title VII of the Civil Rights
Act of 1964, as amended, and in violation of the
Pregnancy Discrimination Act.   Male employees have not
been treated similarly. [45]

Defendant argues that plaintiff's EEOC charge references

incidents that occurred during and prior to 1993, and another that

occurred in 1998; and, from that basis, defendant asserts that all

claims in this action that are not based upon those specific

incidents should be excluded as outside the scope of her EEOC

charge.   This court disagrees.   Specific factual instances are

likely to grow out of the EEOC's investigation of generalized

assertions.   Plaintiff included in her charge allegations

supporting a claim based upon a sexually hostile work environment

theory.  She alleged the harassment involved various individuals in

the fire department.  Any specific facts relating to a hostile work

environment at the City of Homewood fire department are like or

related to the allegations in her EEOC charge.

Plaintiff may not, however, recover under a different legal

---

[45]Plaintiff's evidentiary submission in opposition to defendant's motion
for summary judgment (doc. no. 34), Ex. 7.

theory.  Some of the evidence submitted to this court by plaintiff appears to support a claim that she was denied promotions because of her sex.  A failure to promote claim is not like or related to a hostile work environment claim, because each claim arises from a distinct set of facts and involves a distinct legal theory. Moreover, an EEOC investigation into the denial of promotional opportunities cannot reasonably be expected to grow out of plaintiff's assertion that "I believe that ... I am being discriminated against in the terms and conditions of my employment because of my gender (female) in violation of Title VII ... and in violation of the Pregnancy Discrimination Act," especially when that assertion is juxtaposed to all that preceded it.  To the extent that plaintiff is alleging she was denied a promotion because of her sex, therefore, the court finds that such a claim is beyond the scope of her EEOC charge.

Additionally, plaintiff alleged in her complaint a claim of sexual harassment based upon a *quid pro quo* theory.  Such a claim cannot reasonably be inferred from her EEOC charge and, therefore, also exceeds its scope.  In any event, plaintiff failed to submit any evidence supporting such a claim, and also failed to argue the point in her brief; accordingly, this court finds that she has

abandoned her *quid pro quo* claim.  *Cf. Hartsfield v. Lemacks*, 50
F.3d 950, 953 (11th Cir. 1995) ("[I]ssues that clearly are not
designated in the initial brief ordinarily are considered
abandoned") (quoting *Allstate Insurance Co. v. Swann*, 27 F.3d 1539,
1542 (11th Cir. 1994)).

## C.    Prima Facie Case

The Supreme Court first held that "unwelcome sexual advances
that create an offensive or hostile working environment violate
Title VII" in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64
106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).  Title VII is violated,
and sexual harassment is actionable, whenever the workplace is
permeated with "discriminatory intimidation, ridicule, and insult"
(*id.* at 65, 106 S.Ct. at 2405) that is "sufficiently severe or
pervasive 'to alter the conditions of the victim's employment and
create an abusive working environment.'" Id. at 67, 106 S.Ct. at
2405 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th
Cir. 1982)).

The Eleventh Circuit reiterated the elements a plaintiff must
establish to support a Title VII hostile work environment claim in
*Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999) (*en banc*).
The plaintiff must demonstrate that:    (1) she belongs to a

31

protected group; (2) she was subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment complained of must have been based upon plaintiff's sex; (4) the harassment complained of was sufficiently severe or pervasive as to alter the terms and conditions of employment, and created a discriminatorily intimidating, hostile, or abusive working environment; and (5) a basis for holding the employer liable. *Id.* at 1245; *see also, e.g., Gupta v. Florida Board of Regents,* 212 F.3d 571, 582 (11th Cir. 2000); *Cross v. State of Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Bell v. Crakin Good Bakers, Inc.*, 777 F.2d 1497, 1502-03 (11th Cir. 1985).

Because plaintiff filed her EEOC charge on April 23, 1998,[46] the court will consider, separately and in totality, the discriminatory acts occurring after October 25, 1997. These incidents were described in sections II.B and II.C *supra.*

### 1.   Membership in a protected class

"As in other cases of sexual discrimination, this [element] requires a simple stipulation that the employee is a man or a woman." *Henson*, 682 F.2d at 903.

---

[46]Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment (doc. no. 34), Ex. 7.

### 2.   Unwelcome sexual statements and conduct

The second element of a prima facie hostile work environment claim actually has two components which require independent analysis in this case, because defendant questions plaintiff's proof of both prongs.  First, the statements and conduct complained of must have been "unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive."  *Henson*, 682 F.2d at 903. Second, the statements and conduct complained of must have been

> of a sexual or gender-related nature — "Sexual advances, requests for sexual favors, [or] conduct of a sexual nature," ... — before they are considered in determining whether the severe or pervasive requirement [the fourth element of a prima facie case] is met.   Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted.  Title VII, as it has been aptly observed, is not a "general civility code." ...

*Gupta*, 212 F.3d at 583 (citations omitted); *see also Brill v. Lante Corp.*, 119 F.3d 1266, 1274 (7th Cir. 1997) (rejecting attempt to buttress hostile environment claim with evidence of unpleasant, but non-sexual conduct).

### a.   The requirement of "unwelcomeness"

Defendant argues that the incidents plaintiff complains about were welcome.  Defendant points to evidence that plaintiff engaged in farting and belching contests, glued some of her male co-

33

workers' underwear together, and wrestled with her male co-workers at the workplace as proof of this assertion.[47]  Defendant claims that plaintiff not only participated in, but thereby encouraged such behavior.[48]

The "gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'"  *Meritor*, 477 U.S. at 68, 106 S.Ct. at 2406 (citing 29 C.F.R. § 1604.11(a)).  The Eleventh Circuit defined "unwelcome conduct" in *Henson* as statements or acts that "the employee did not solicit or incite ... and ... that the employee regarded ... as undesirable or offensive."  682 F.2d at 903.

The issue of whether particular statements and conduct were "unwelcome" is factual, and is determined by consideration of the totality of the circumstances, including such factors as:  "the complainant's 'sexually provocative speech or dress,' participation in sexual horseplay and use of foul language at work, friendly association with the alleged harasser, and failure to report alleged incidents of harassment to superiors."  Barbara Lindemann and David D. Kadue, *Sexual Harassment in Employment Law* 171-72

---

[47]Brief in Support of Defendant's Motion for Summary Judgment (doc. no. 32) at 20.

[48]*Id.*

(1992) (footnotes omitted).[49]

The "unwelcomeness" inquiry has both a subjective and an objective component. *See Meritor*, 477 U.S. at 68, 106 S.Ct. at 2406 ("The correct inquiry is whether [the plaintiff] <u>by her conduct</u> indicated that the alleged sexual advances were unwelcome." (emphasis supplied)); *see also* EEOC Policy Guidance on Sexual Harassment, 8 Fair Employment Practice Manual (BNA) 405:6686 n.10 (March 19, 1990) ("Investigators and triers of fact rely on objective evidence, rather than subjective, uncommunicated feelings.").

The objective component of the inquiry is demonstrated by a decision of the U.S. District Court for the District of New Jersey, *Ukarish v. Magnesium Elektron*, 31 Fair Empl. Prac. Cases 1315, 1983 WL 593 (D.N.J. March 1, 1983). There, the plaintiff complained of a sexually hostile workplace created by the vulgar language of a co-worker.[50]   Entries in a diary maintained by the plaintiff

---

[49]*See also* Lindemann & Kadue, Sexual Harassment in Employment Law 171 (same statement), 143 ("An inquiry into 'welcomeness' may properly consider the complainant's contemporaneous clothing, conduct, and speech.") (1992); *Tindall v. Housing Authority of the City of Fort Smith*, 762 F. Supp. 259, 263 (W.D. Ark. 1991) (where the court observed "there are workplaces where considerable sexual horseplay of a low-level and consensual nature occurs among certain of the workers," and such environmental factors should be taken into account when determining whether the conduct and statements complained of were objectively "unwelcome").

[50]For example, the plaintiff and the co-worker she complained of "began a pattern of dialogue ... which involved the exchange of sexually-oriented language, usually in jest or incidentally.  Such terms as 'fuck you,' 'How the fuck are you,' 'Shove this pole up your ass,' 'You bitch,' 'asshole,' 'jerkoff,'

indicated that she subjectively found the crude and coarse banter to be unwelcome, but the district court held that all of the objective evidence indicated that the plaintiff "appeared to accept it <u>and joined in it as one of the boys</u> and did not complain to anyone at [her place of employment] about these events except on one occasion."   1983 WL 593, at *4 (emphasis supplied).[51]   The district court accordingly held that the plaintiff had failed to prove this element of a prima facie hostile work environment claim.

Another district court held that a plaintiff failed to prove that she was truly offended by allegedly offensive conduct when the

---

'It's down to here,' 'fucking bastard,' and the [word] 'fucking' used as an adjective to describe any number of items or events."   The court noted that

> this language or various permutations of it was used by both Mrs. Ukarish and Mr. Miller [the co-worker complained of] in casual conversations on a rather continuing basis during the time that they were in proximity in the course of the job.   However distasteful this language might be in a court of law, it was nevertheless the rather customary plant language that pervaded that atmosphere.   It was no better or no worse than it had been before Mrs. Ukarish arrived and was not directed at her either by Mr. Miller or by the other workers on the job in any intensified degree.

Ukarish v. Magnesium Elektron, 1983 WL 593, at *4 (D.N.J. March 1, 1983).

[51]*See also id.*, at *8, where the court observed:

> In this case, as I have indicated before, there are some indications from the [plaintiff's] diary that subjectively the banter, the exchange, if you will, between herself and Miller was not a welcome circumstance.   Nevertheless, objectively or to everyone else in the plant atmosphere there were no indications of any serious disagreement or unwelcome nature, if you will, with regard to the plant atmosphere.   Mrs. Ukarish liked her job.   She liked the pay.   She wanted to stay, and she certainly demonstrated every willingness to at least condone, if not participate in, the type of floor language, if you will, and references that have been very much a part of the atmosphere long before she arrived.

objective evidence demonstrated that she "acted like 'one of the boys' and freely joined in sexual jokes with the men." *Tindall v. Housing Authority of the City of Fort Smith*, 762 F. Supp. 259, 263 (W.D. Ark. 1991).

Based upon the foregoing discussion, it can be seen that defendant's contention that plaintiff did not find the conduct about which she now complains to be "unwelcome" arguably has some merit. Even so, it is clear that plaintiff did not welcome the February 18, 1998 encounter with Deputy Fire Chief Parker. Therefore, the court assumes, without deciding, that at least some of the incidents about which plaintiff complains were unwelcome.

### b. The sexual nature of the conduct complained of

Defendant further argues that the conduct at issue was not sexual in nature. To be sure, plaintiff has not alleged that she was subjected to unwelcome sexual advances or requests for sexual favors. She does, however, allege that she was subjected to unwelcome hazing because of her gender.[52] Courts have indicated

---

[52]*See* Lindemann & Kadue, Sexual Harassment in Employment Law 82 (1992), defining "hazing" as consisting of

> offensive conduct, usually not overtly sexual in nature, that is visited upon a complainant because of gender. Acts of physical aggression, threats of physical violence, and arguably ambiguous conduct, such as urinating in a female co-worker's gas tank, through not inherently sexual in nature, can nonetheless constitute harassment on the basis of sex. The purpose of this behavior, as in explicit gender-baiting cases, is to harass, intimidate, and make life unpleasant for the complainant. ... [Footnotes omitted.]

that gender-based hazing may be a violation of Title VII, even when the actual activity is not clearly of a sexual nature. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) (noting that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex," provided "it is clear that the harasser is motivated by general hostility to the presence of women in the workplace"); *Smith v. St. Louis University*, 109 F.3d 1261, 1265 (8th Cir. 1997) (rejecting argument that derogatory comments based on gender were not severe because they were not sexual); *Hall v. Gus Construction Co.*, 842 F.2d 1010, 1013-14 (8th Cir. 1988) (considering evidence that female construction workers were given offensive nicknames, that their trucks were not repaired, and that male co-workers urinated in their gas tanks). The court accordingly rejects this prong of defendant's argument.

### 3.   Based on sex

The third element of a prima facie sexually hostile work environment claim is that the harassment complained of was based upon the plaintiff's sex.

> The essence of a disparate treatment claim under Title
> VII is that an employee or applicant is intentionally
> singled out for adverse treatment on the basis of a
> prohibited criterion. ... In proving a claim for a

38

> hostile work environment due to sexual harassment,
> therefore, the plaintiff must show that but for the fact
> of her sex, she would not have been the object of
> harassment.  ...

*Henson*, 682 F.2d 903-04 (citations omitted).  "[U]nfair treatment of an employee, standing alone, does not make out a Title VII case; the mistreatment must be because the employee was female." *Bell v. Crakin Good Bakers, Inc.*, 777 F.2d 1497, 1504 (11th Cir. 1985) (Hill, J., concurring in part; dissenting in part.)

> Title VII was never intended to protect employees
> from all unpleasant and rude conduct in the workplace.
> It is an anti-discrimination statute. ... "The critical
> issue ... is whether members of one sex are exposed to
> disadvantageous terms or conditions of employment to
> which members of the other sex are not exposed."

*Mendoza*, 195 F.3d at 1254 (Edmondson, J., concurring) (quoting *Oncale*, 523 U.S. at 80, 118 S.Ct. at 1102).

The court finds that plaintiff has satisfied this element. She has offered evidence that she was treated differently from male firefighters, and that such disparate treatment was based upon her gender.

### 4.   Severe or pervasive

The fourth element of a prima facie case that must be established by a plaintiff is that the harassment complained of was sufficiently severe or pervasive to alter the terms and conditions

of employment, and that it created a discriminatorily intimidating, hostile, or abusive working environment. The fourth element serves to emphasize two interrelated principles: first, sexual harassment becomes actionable under Title VII _only when_ it alters the terms, conditions, or privileges of employment; and, second, harassment alters the terms, conditions, or privileges of employment _only when_ it is demonstrably severe or pervasive. _Meritor_, 477 U.S. at 67, 106 S.Ct. at 2405 ("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII. ... For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.") (citing _Rogers v. EEOC_, 454 F.2d 234, 238 (5th Cir. 1971) ("mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not sufficiently affect the conditions of employment to implicate Title VII), _cert. denied_, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)).

Indeed, even though Title VII's prohibition against sex discrimination unequivocally includes sexual harassment, Title VII still is not a "general [federal] civility code," _Faragher v. City_

of *Boca Raton*, 524 U.S 775, 788, 118 S.Ct. 2275, 2283-84, 141
L.Ed.2d 662 (1988).   Neither the Supreme Court nor the Eleventh
Circuit has ever held "that workplace harassment ... is
automatically discrimination because of sex merely because the
words used have sexual content or connotations." *Oncale*, 523 U.S.
at __, 118 S.Ct. at 1000-02; *see also Mendoza*, 195 F.3d at 1245.

Rather, "[a] recurring point in these opinions is that 'simple
teasing,' offhand comments, and isolated incidents (unless
extremely serious) will not amount to discriminatory changes in the
'terms and conditions of employment.'" *Faragher,*, 524 U.S. at 788,
118 S.Ct. at 2283 (internal citation omitted); *see also DeAngelis
v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir.
1995) ("A hostile environment claim embodies a series of criteria
that express extremely insensitive conduct against women, conduct
so egregious as to alter the conditions of employment and destroy
their equal opportunity in the workplace."); *Indest v. Freeman
Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) ("All of the
sexual hostile environment cases decided by the Supreme Court have
involved patterns or allegations of extensive, longlasting,
unredressed, and uninhibited sexual threats or conduct that
permeated the plaintiffs' work environment.").

Thus, the fourth element of a prima facie case

> is the element that tests the mettle of most sexual
> harassment claims. Requiring the plaintiff to prove that
> the harassment is severe or pervasive ensures that Title
> VII does not become a mere general civility code.  ...
> This requirement is regarded as crucial, and as
> sufficient to ensure that courts and juries do not
> mistake ordinary socializing in the workplace — such as
> male-on-male horseplay or intersexual flirtation — for
> discriminatory conditions of employment.

*Gupta*, 212 F.3d at 583 (internal quotation marks and citations

omitted).

When assessing the severity and pervasiveness of sexual

harassment claims, district courts are instructed to "consider the

alleged conduct in context and cumulatively," and to "look at the

totality of the circumstances."  *Mendoza*, 195 F.3d at 1242.

Moreover, the conduct complained of must be evaluated from two

perspectives:  one subjective and the other objective.

> Conduct that is not severe or pervasive enough to create
> an objectively hostile or abusive work environment — an
> environment that a reasonable person would find hostile
> or abusive — is beyond Title VII's purview.  Likewise,
> if the victim does not subjectively perceive the
> environment to be abusive, the conduct has not actually
> altered the conditions of the victim's employment, and
> there is no Title VII violation.

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22, 114 S.Ct.

367, 370, 126 L.Ed.2d 295 (1993); *see also Faragher*, 524 U.S. at

788, 118 S.Ct. at 2284 (explaining that the objective component of

42

the "severe and pervasive" element prevents "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" from falling under Title VII's broad protections).

The Eleventh Circuit recently observed that the "objective component of this analysis is somewhat fact intensive." *Mendoza*, 195 F.3d at 1246. Even so, that does not mean the issue must be submitted to a jury. To the contrary, the Supreme Court and Eleventh Circuit have identified four factors that <u>courts</u> should compare to the conduct complained of when determining, as a matter of law, whether alleged acts of harassment "objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* (citing *Harris*, 510 U.S. at 23, 114 S.Ct. at 371, and *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997)); *see also Gupta*, 212 F.3d at 584 ("There are four factors that we consider in determining whether [the sexual or gender-related statements and conduct] are sufficiently severe and pervasive from an objective standpoint to alter an employee's terms or conditions of employment.").

"Sexual harassment in the workplace is a serious matter." *Mendoza*, 195 F.3d at 1252 n.10. Consequently, district courts are compelled to carefully compare the four enumerated factors to the conduct complained of by a plaintiff in order to avoid "trivializ[ing] true instances of sexual harassment." *Id*. "These factors ... delineate a minimum level of severity or pervasiveness necessary [as a matter of law] for harassing conduct to constitute discrimination in violation of Title VII." *Id.*, at 1246.[53] If district courts allow hostile work environment claims to go forward on the basis of facts that do not demonstrably meet or exceed the enumerated standards, that "would lower the bar of Title VII to punish mere bothersome and uncomfortable conduct, and would 'trivialize true instances of sexual harassment.'" *Gupta*, 212 F.3d at 586 (quoting *Mendoza*, 195 F.3d at 1252 n.10).

"It is not enough that a supervisor or coworker fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor. Such failures are too commonplace in today's America, regardless of the sex of the employee, to be classified as discriminatory." *Minor v. Ivy Tech State College*, 174 F.3d 855, 858 (7th Cir. 1999). That is because "Title VII does

---

[53]In *Mendoza*, the Eleventh Circuit determined *en banc* that the conduct complained of by the plaintiff was "<u>insufficient as a matter of law</u> to sustain hostile-environment claims." 195 F.3d at 1252 & n. 10 (emphasis supplied).

not attempt to purge the workplace of vulgarity," *Hopkins v. Baltimore Gas and Electric Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (internal quotation marks and citation omitted), nor did Congress "expect employers to purify the language in the workplace or remove all vulgarity or coarse comments." *Johnson v. Hondo, Inc.*, 940 F. Supp. 1403, 1410 (E.D. Wis. 1996). Moreover, conduct which amounts to "mere locker room antics, joking, or horseplay" also is beyond the purview of Title VII. *Tietgen v. Brown's Westminster Motors, Inc.*, 921 F. Supp. 1495, 1501 (E.D. Va. 1996).[54]

Here, plaintiff has been subjected to a lurching fire engine, a co-worker's reaching towards her breasts, a delay in receiving safety pants, a supervisor's feeling her pregnant stomach after making offensive comments, an assignment to "ride the engine" while she was pregnant, and a special driver training class. These incidents were neither frequent, because they occurred over roughly

---

[54]*See also Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987) (to be deemed pervasive, the conduct must be more than episodic; it must be sufficiently continuous and concerted), *overruled on other grounds by Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2362, 105 L.Ed.2d 132 (1989); *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983) (isolated incidents generally not sufficient to create hostile working environment); *Baskerville v. Culligan International Co.*, 50 F.3d 428, 430 (7th Cir. 1995) ("A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage."); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (relatively isolated incidences of non-severe conduct do not rise to the level of a hostile environment); *Christoforou v. Ryder Truck Rental*, 668 F. Supp. 294, 301 (S.D. N.Y. 1987) (Although the level of behavior needed to create a hostile environment "cannot be precisely defined," it is "clearly more abusive, pervasive and persistent" than three specific incidents of sexual harassment over an 18 month period.).

a two-year period, nor — when objectively considered in the light of the foregoing principles — severe.

In fact, only three of the incidents occurring within the ten year period from which plaintiff has dredged examples of objectionable conduct can even arguably be described as potentially physically threatening or humiliating.

The most severe incident is the one in which firefighter Johnny West ran over plaintiff's foot with the rescue unit truck. A contemporaneous incident report recorded that her foot was "severely bruised."   Even though plaintiff filed a workmen's compensation claim,[55] she has not introduced evidence that she was taken to the hospital, or that she was absent from work for more than one day.  Despite her contention that the _incident_ constituted sexual harassment, plaintiff did not consider the _injury_ to have been intentionally inflicted.

> Q.   Are you saying today he intentionally ran over you?
>
> A.    I don't say that he intentionally ran over me.  I say that his activity by being aggressive and threatening towards me resulted in an accident.[56]

As noted in section II.A _supra_, however, that event occurred on May

---

[55]Plaintiff has filed 14 workmen's compensation claims while at the fire department.   These include a claim that her wrist became numb while she was typing, a claim that her heart rate was elevated, and a claim that she sprayed oven cleaner in her eyes.  Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment (doc. no. 34), Ex. 46.

[56]Stoney deposition at 131.

31, 1996, nearly two years before plaintiff filed her EEOC charge and, accordingly, it is time barred. (*See* discussion in section III.A *supra*.)

The second incident involving physical contact was plaintiff's February 18, 1998 meeting with Deputy Fire Chief Parker, during which he smoothed plaintiff's shirt over her stomach, asked her whether she knew what caused pregnancies, told her she should see a psychiatrist, and indicated that he had assisted her in retaining employment by falsifying her time on the "hose drag" physical test. Parker's unsolicited touching of plaintiff's pregnant stomach undoubtedly was offensive to her, and possibly humiliating in context. Even so, it was not physically threatening, and, it did not rise to the level of severity necessary to trigger actionable conduct under Title VII. For example, in *Brooks v. City of San Mateo*, 214 F.3d 1082 (9th Cir. 2000), the Ninth Circuit held that a single incident in which a co-worker placed his hand on the plaintiff's stomach, commented on its sexiness, and then reached his hand down her sweater to feel her bare breast, was not sufficiently severe to constitute a Title VII violation. In contrast, the offensive touching that occurred here was neither a sexual advance, nor accompanied by sexual overtures. Rather, the touching occurred during a meeting concerning plaintiff's ability

47

to continue working as a firefighter during the remainder of her pregnancy.  Plaintiff admitted that Deputy Chief Parker was trying "to see how far [her] belly stuck out."[57]  By plaintiff's own account of the incident, Deputy Chief Parker stated his concern about the health of her unborn child:  "His statement to me was that since I more concerned with the financial aspects of my situation than my child, then somebody should be concerned about my child."[58]  "Mere solicitude, even if repetitive, is not sexually harassing behavior."  *Gupta*, 212 F.3d at 583.  Even though Parker's statement was offensive to plaintiff, it is not the type of severe, sexual comment contemplated in Title VII.  The "mere utterance" of derogatory statements "which engender offensive feelings in an employee" is not actionable.  *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405.  Parker's question, asking whether plaintiff had figured out what causes pregnancies, and his statement that she should see a psychiatrist, appear equally innocuous when viewed objectively in the context of all circumstances.

Finally, Dale Dudley did not actually touch plaintiff's breasts; rather, he only made a gesture indicating that he intended to do so, laughed, and walked away.  Objectively, such conduct was

---

[57]*Id*. at 221.

[58]*Id*. at 224.

neither physically threatening nor humiliating.

This court further concludes that the six incidents occurring since October of 1997 (see sections II.B & C *supra*), considered both individually and collectively, would not have interfered with a reasonable employee's job performance.

In short, the conduct complained of was not sufficiently severe or pervasive to constitute a hostile work environment. *See, e.g., Shepherd v. Comptroller of Public Accounts of Texas*, 168 F.3d 871, 872-75 (5th Cir. 1999), (holding that several incidents over a two year period — including a comment that "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down plaintiff's dress — were insufficient to support a hostile work environment claim); *Minor*, 174 F.3d at 857 (holding that plaintiff had not demonstrated a hostile work environment where her supervisor, among other things, "put his arms around [the plaintiff], kissed her, squeezed her, and said, 'Now, is this sexual harassment?'"); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365-1366 (10th Cir. 1997) (holding that five incidents of "sexually-oriented, offensive" statements over a sixteen month period were "sporadic," and insufficient to establish a hostile

work environment, even though one of the harasser's statements occurred when he put his arm around the plaintiff, looked down her dress, and said, "Well, you got to get it when you can").

**IV. CONCLUSION**

Six incidents of conduct that are mildly harassing at best, occurring over a two year period, are insufficiently severe or pervasive to constitute a violation of Title VII. Accordingly, this court finds that defendant's motion for summary judgement is due to be granted. An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this 27th day of November, 2000.

_____
United States District Judge

50